Peter W. Billings, A0330
Jason W. Hardin, A8793
Timothy K. Clark, A10778
FABIAN & CLENDENIN,
  A Professional Corporation
Mailing Address:
  P.O.  Box 510210
  Salt Lake City, Utah 84151-0210
Physical Address:
  215 South State Street, 12th Floor
  Salt Lake City, Utah 84111
Telephone:     (801) 531-8900
Facsimile:     (801) 596-2814
E-mail:        pbillings@fabianlaw.com
               jhardin@fabianlaw.com
               tclark@fabianlaw.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

|  |  |
|---|---|
| MONITRONICS INTERNATIONAL, INC., a Texas corporation; MONITRONICS FUNDING, LP, a Delaware limited partnership; and MONITRONICS SECURITY, LP, a Delaware limited partnership; <br><br> Plaintiffs, <br><br> vs. <br><br> ICON SECURITY, INC., a Utah corporation; JAKE FISHER, an individual**;** and JOHN DOES 1-20; <br><br> Defendants. | Case No. _____ <br><br> **COMPLAINT** <br><br><br><br> Honorable _____ |

Plaintiffs Monitronics International, Inc., Monitronics Funding, LP, and Monitronics

Security, LP complain and allege as follows:

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Monitronics International, Inc. is a Texas corporation with its principal place of business in Dallas, Texas.

2.      Plaintiff Monitronics Funding, LP is a Delaware limited partnership with its principal place of business in Dallas, Texas.

3.      Plaintiff Monitronics Security, LP is a Delaware limited partnership with its principal place of business in Dallas, Texas.

4.      On or about August 7, 2007, Monitronics International, Inc. caused to be transferred to Monitronics Funding, LP certain of Monitronics International, Inc.'s assets, including, but not limited to, all of the **Dealer AMPA's** (as defined *infra*), all of the **Customer AMA's** (as defined *infra*) and **Monitronics' Marks** (as defined *infra*).  On or about August 7, 2007, Monitronics International, Inc. caused certain other of its operating assets to be transferred to Monitronics Security, LP.  Monitronics International, Inc., Monitronics Funding, LP and Monitronics Security, LP are collectively referred to herein as "**Monitronics.**"

5.      Defendant Icon Security, Inc. ("**Icon**") is a Utah corporation with its principal place of business in Utah County, Utah.

6.      Defendant Jake Fisher ("**Fisher**") is an individual who, on information and belief, resides in Washington County, Utah.

7.      On information and belief, Defendants JOHN DOES 1-20 are individuals or entities who have engaged in many of the activities detailed below, but whose identities are not yet known to Monitronics.  Monitronics hereby expressly reserves the right to amend this

2

Complaint at a later date to specifically add such individuals or entities as named parties once their identities become known to Monitronics.

8.      Subject matter jurisdiction is proper with this Court pursuant to 28 U.S.C. §§ 1331, 1332 and 1338.

9.      All of the Defendants are subject to the personal jurisdiction of this Court.

10.     Venue is proper in the United States District Court, District of Utah pursuant to 28 U.S.C. § 1391.

## MONITRONICS

11.     Monitronics is the nation's fourth-largest alarm monitoring service provider, providing service to over 500,000 residential and business customers throughout the U.S. (the "**Customers**").  This involves the monitoring of signals from the homes and businesses of Monitronics' customers, which may arise from burglaries, fires and other events.  The alarm monitoring is done at the company's central monitoring station in Dallas, Texas.

12.     Monitronics has two registered service marks (the "**Monitronics' Marks**") with the United States Patent and Trademark Office (the "**PTO**"): "Monitronics," Reg. No. 2,034,953 on February 4, 1997, and "Monitronics International, Inc.," Reg. No. 2,308,760 on January 8, 2000.

13.     On December 13, 2002, Monitronics filed with the PTO a Combined Declaration of Use and Incontestability Under §§ 8 & 15 stating, in compliance with 15 U.S.C. § 1065, that the "Monitronics" registered mark had been in continuous use for five (5) consecutive years and was, and still is, in use in commerce; that there had been no final decision adverse to Monitronics claim of ownership of that mark for the goods and services described in the

3

registration or to Monitronics' right to register the same or to keep the same on the register; and that there was, and had been, no proceeding involving these rights pending in the Patent and Trademark Office or in any court.

14.     On May 21, 2007, the PTO notified Monitronics that it had renewed the registration of the "Monitronics" mark.

15.     On April 16, 2005, Monitronics filed with the PTO a Combined Declaration of Use and Incontestability Under Sections 8 & 15, stating, in compliance with 15 U.S.C. § 1065, that the aforementioned "Monitronics International, Inc." registered mark had been in continuous use for five (5) consecutive years and was, and still is, in use in commerce; that there had been no final decision adverse to Monitronics' claim of ownership of that mark for the goods and services described in the registration or to Monitronics' right to register the same or to keep the same on the register; and that there was, and had been, no proceeding involving these rights pending in the Patent and Trademark Office or in any court.

## THE INDUSTRY

16.     Within the security monitoring industry, independent dealers solicit customers for alarm systems and alarm monitoring service through a variety of methods, including door-to-door and telemarketing.

17.     The door-to-door solicitation is done primarily in the summer months as some independent dealers primarily use college students to do the solicitation during their summer breaks.  These independent dealers begin their recruiting of these students each fall for the following summer.

4

18.     Where the dealers' salespersons are successful in signing up customers, the dealer typically enters enter two contracts with the customer, one for the sale and installation of the alarm monitoring equipment (the **"Installation Agreement"**) and a second alarm monitoring agreement related solely to the monitoring of the customer's premise (the **"Customer AMA"**).

19.     The typical Customer AMA provides for the monitoring of that customer's premises for a stated term, usually three (3) years, with automatic one (1) year renewals thereafter.  The average lifespan of a Customer AMA is for a period of eight (8) to ten (10) years.

20.     The independent dealers usually offer to sell their Customer AMA's to separate alarm monitoring companies, like Monitronics.

21.     Before it purchases a Customer AMA, Monitronics conducts due diligence on the customer.  As part of this due diligence, Monitronics asks if the potential customer is currently under contract with another alarm monitoring service.  If Monitronics learns that the potential customer is under contract with a competitor, Monitronics does not acquire the Customer AMA from that independent dealer.

## ICON

22.     Icon is an independent dealer of alarm systems and alarm monitoring service.

23.     Icon employs a significant number of college students for its door-to-door solicitation during the summer months.

24.     Fisher is one of Icon's salespersons.

25.     Icon is not, and never has been, an authorized dealer of Monitronics, does not have, and never has had, a Dealer AMPA with Monitronics and has no, and never has had any,

basis to represent to Monitronics customers that it is in any way associated or affiliated with Monitronics.

26.　　Icon sells most of its Customer AMA's to Security Associates International, Inc. ("**SAI**").

## MONITRONICS DISCOVERS A PROBLEM

27.　　Because of the importance of long-lasting relationships with its customers, Monitronics employees attempt to contact all customers from whom Monitronics receives a cancellation notice to determine the reason for the cancellation and to attempt to retain them as customers.

28.　　Once a customer has cancelled, however, it is difficult for Monitronics to persuade them to return to Monitronics.

29.　　Of the total number of customers that cancel their alarm monitoring service, Monitronics employees are typically able to contact and interview around 30% of those lost customers.  And of those 30% Monitronics contacts, Monitronics does not necessarily determine why each was canceling, but is able to persuade approximately 10% to 15% to stay with Monitronics.  Monitronics has no way of determining the reasons for cancellation for approximately 70% of its terminating customers because it is unsuccessful in contacting them.

30.　　Early this summer, a significant and unusual number of customers began canceling their monitoring service contracts with Monitronics.  The rate of attrition was unusually high in many different geographic areas, such as Raleigh, North Carolina; Gary, Indiana; Chicago, Illinois; Minneapolis/St. Paul, Minnesota; and Fort Worth/Arlington, Texas.

31.     In some of those areas, Monitronics lost two (2) to five (5) times the number of accounts in May–June of this year as compared to those that Monitronics lost in May–June of last year.

32.     In the Raleigh/Durham/Chapel Hill, North Carolina area, Monitronics lost 173 customers in May–June of 2007, whereas it only lost twenty-five (25) customers during the same period 2006.  Monitronics has not been able to verify the cause of all of these attritions as it has been unable to interview all of the terminating customers.  But, based on discussions with customers, Icon has wrongfully induced a significant number of Monitronics customers in the Raleigh/Durham/Chapel Hill, North Carolina area to terminate their Customer AMA's with Monitronics.

33.     In addition, in the Gary, Indiana area, Monitronics lost 257 customers in May–June of 2007, whereas it only lost 48 customers during the same period in 2006.  Monitronics has not been able to verify the cause of all of these attritions as it has been unable to interview all of the terminating customers.  But, based on discussions with customers, Icon has wrongfully induced a significant number of Monitronics customers in the Gary, Indiana area to terminate their Customer AMA's with Monitronics.

34.     In the Chicago, Illinois area, Monitronics also lost 646 customers in May–June of 2007, whereas it only lost 439 customers during the same period in 2006.  Monitronics has not been able to verify the cause of all of these attritions as it has been unable to interview all of the terminating customers.  But, based on discussions with customers, Icon has wrongfully induced a significant number of Monitronics customers in the Chicago, Illinois area to terminate their Customer AMA's with Monitronics.

35.     In the Minneapolis/St. Paul, Minnesota area, Monitronics lost 505 customers in May–June of 2007, whereas it only lost 255 customers during that same period in 2006. Monitronics has not been able to verify the cause of all of these attritions as it has been unable to interview all of the terminating customers.  But, based on discussions with customers, Icon has wrongfully induced a significant number of Monitronics customers in the Minneapolis/St. Paul, Minnesota area to terminate their Customer AMA's with Monitronics.

36.     In the Fort Worth/Arlington, Texas area, Monitronics lost 218 customers in May–June of 2007, whereas it only lost 174 customers during that same period in 2006.  Monitronics has not been able to verify the cause of all of these attritions as it has been unable to interview all of the terminating customers.  But, based on discussions with customers, Icon has wrongfully induced a significant number of Monitronics customers in the Fort Worth/Arlington, Texas area to terminate their Customer AMA's with Monitronics.

37.     In the Detroit, Michigan area, for example, Monitronics lost 319 customers in May–June of 2007, whereas it only lost 124 customers during the same period in 2006. Monitronics has not been able to verify the cause of all of these attritions as it has been unable to interview all of the terminating customers.  But, based on discussions with customers, Icon has wrongfully induced a significant number of Monitronics customers in the Detroit, Michigan area to terminate their Customer AMA's with Monitronics.

38.     Attrition continues to be unusually high in these and other market areas.

39.     As a result of numerous Monitronics' customers reporting misrepresentations by salespersons earlier this year, Monitronics created a form for its employees to use in customer

interviews with those terminating customers—the "Summer Attrition Postcard–Response Form" (the **"Attrition Form"**).

40.     In order to memorialize oral conversations with customers, Monitronics' employees contemporaneously enter the information given by the customers during the interview into an electronic database (the "**Customer Notes**") and, when a customer was seeking termination and other suspicious activities were apparent, on the Attrition Forms.

41.     Among other information, the Attrition Forms contain the following information: what the salesperson told the terminating customer in order to get the customer to change from Monitronics to a competitor; what company the salesperson purported to represent; the central monitoring station; whether the salesperson offered a system upgrade or a new system and what elements were allegedly added; whether they were happy with Monitronics' monitoring and service; whether they intended to cancel their service prior to the visit from the salesperson; whether the salesperson cancelled their monitoring service for them; whether the terminating customer thought the information given to them was deceptive; and particularized notes regarding or statements from the customer.

42.     At least fifty-four (54) Monitronics customers have cancelled their accounts and signed up with Icon since May 1, 2007.   This number is based on the number of Attrition Forms identifying Icon as the sales company who approached the customer, as well as Customer Notes and cancellation letters.

43.     Several of the customers could not remember the names of the company that called on them, but, on information and belief, some of these were Icon salespersons.

9

44.     Monitronics is receiving additional cancellation letters and Attrition Forms daily. And, in light of the fact that Monitronics is not able to contact all of the terminating customers, there are likely more customers who were wrongfully induced to switch to Icon.

## THE DECEPTIVE AND ILLEGAL ACTS OF ICON AND ITS SALESPERSONS

45.     Monitronics' discussions with its current and former customers and its use of the Attrition Forms helped it uncover a vast scheme by Icon and its salespersons to steal Monitronics' customers by, among other things, flatly lying to Monitronics' Customers and tricking them into canceling their monitoring services with Monitronics and signing new monitoring agreements with Icon.

46.     Specifically, signed declarations by customers / former customers of Monitronics executed under penalty of perjury show:

a.     That two men claiming to be from Icon Security and SAI came to the house of Willie Newborn, a wheelchair-bound eighty-four (84) year old stroke victim who lives alone in Gary, Indiana; that, according to Ms. Newborn, the two men told her that "Monitronics, my current alarm monitoring company, was going out of business;" that they told her "that I needed a new monitoring company and that I needed to update my paperwork;" that one of the salesmen told her that "I needed a cancellation letter on file with Monitronics to ensure a smooth transition;" that the salesman drafted the letter, which Ms. Newborn signed, and which the salesperson sent to Monitronics; that, after Monitronics called Ms. Newborn to determine why she had cancelled and after Monitronics told Ms. Newborn that Monitronics was not going out of business and that the two men did not represent Monitronics, Ms. Newborn stated that this made her

"extremely upset" and that "[t]hose two men had taken advantage of" her; and that, although Ms. Newborn is wheelchair bound, she "took the Icon/SAI sign out of [her] yard and peeled all of their stickers off [her] windows and then took great pleasure in throwing them all in the trash;"

       b.      That door-to-door salespersons, a man and a woman, told and assured a fifty-nine (59) year old man, Henry Woods, who lives in Dolton, Illinois, that "We are with your monitoring company, Monitronics," that "Monitronics is no longer associated with Apex, who installed your system" and that, instead, "Icon Security is in partnership with Monitronics and we represent Icon too;" that they convinced Mr. Woods to sign a bunch of paperwork, including a monitoring agreement, which he thought was still with Monitronics, and a general cancellation letter made out to "To Whom It May Concern;" that, when they asked Mr. Woods as part of a follow-up questionnaire, whether he was with another monitoring company, he said 'no' because they said they were from Monitronics;" that Mr. Woods first learned that these salespersons were not with Monitronics when Monitronics called him asking why he cancelled his account; that Mr. Woods then called Icon Security, who said there had been a "misunderstanding;" that he "asked [Icon] to send the two salesmen back to [his] house so [they] could clear up the 'misunderstanding;'" but that Icon hung up on him;

       c.      That two door-to-door salesmen told sixty-nine (69) year old Emiline Grisson from Durham, North Carolina, that they were in the area upgrading home security systems; that the salesperson "made it sound like his company, Icon Security, was connected to Monitronics, and that they were working together but that Icon was

taking over [her] account as it was closer to [her] home;" that it "makes [her] very angry that the company supposed to be keeping people secure treated [her] like this;"

     d.     That a door-to-door salesperson first told seventy-five (75) year old Theresa Dalton, who lives in Flint, Michigan, that they were "upgrading and updating" her alarm equipment and monitoring plan; that the second time they came around, the salesperson identified himself as from Icon Security; that he knew that Ms. Dalton had two months left on her Monitronics contract and offered to pay off those last two months; that the salesperson convinced her to sign a new agreement with Icon and cancel her account with Monitronics; that the salesman drafted a cancellation letter to Monitronics for her to sign, and he sent in the cancellation;

     e.     That in June of this year, two door-to-door salespersons, a young man and a young woman, told fifty-five (55) year old Ivery McCarter, from Dolton, Illinois, that "Monitronics would not be monitoring [her] alarm system;" that Mr. McCarter was understandably concerned; that Mr. McCarter stated that "I feel as if I have been defrauded or conned by Icon;" that he would not have cancelled Monitronics had the Icon salesperson told him the truth – "that he worked for a competitor of Monitronics;"

     f.     That a door-to-door salesperson told sixty-two (62) year old Lovell McDaniels, from Chicago, Illinois, that they were there to upgrade his security system; that Mr. McDaniels stated, "I asked what company they were with, they said they were with Monitronics;" that he "let them in and they proceeded to upgrade the system;" that they never told Mr. McDaniels that he would be changing companies, only that they were upgrading his system; that, after he signed the papers, he realized based on the stickers in

the window and the sign in his yard, that it was a different monitoring company than Monitronics; that he called Icon to complain; that the supervisor told him that it was too late to do anything about it because, "three days had passed and if I tried to get out of the contract, [it] would ruin [his] credit;" that, prior to the visit from the Icon salesman, Mr. McDaniels was happy with Monitronics and did not intend to cancel his monitoring services and that he would not have cancelled Monitronics' services "had the Icon salesman told her the truth – that he worked for a competitor of Monitronics;"

g.      That in June of this year, two door-to-door salespersons, a young man and a young woman, told seventy-six (76) year old Mary Schad, from Arlington, Texas, that "Monitronics would not be monitoring [her] alarm system, and that [her] alarm battery was subject to failure, but that they could take care of that;" that this was a shock to Ms. Schad as he had not heard anything from Monitronics to this effect; that Ms. Schad was concerned as "it sounded like no one would be monitoring my alarm;" that, looking back, Ms. Schad believed them "because I could not doubt that someone would come and tell [her] something like this if it was such a brazen and blatant falsehood;" that she feels "someone should go to jail because of this," that "[t]his is very embarrassing for" her and that she "feel[s] as if [she] ha[s] been defrauded or conned by Icon;" and that she would not have cancelled Monitronics had the Icon salesperson told him the truth – "that he worked for a competitor of Monitronics;" and

h.      That in June of this year, two door-to-door salesmen approached Jerrilyn Johnson in Minneapolis, Minnesota, about "upgrading" her equipment and switching her monitoring company; that one of those salespersons was Kerry Snell; that they told her

13

that a new digital system was necessary because burglars had been cutting lines; that they also said that she needed to switch from Monitronics because "they had received several complaints about Monitronics being slow to respond to alarms;" that, according to Ms. Johnson, the salespersons "were very slick and confused [her] with technical jargon and the names of numerous companies," but that she believed them "because everything they said was spoken in a way to make [her] believe that they were with the same company [she] was already with;" that Mr. Snell drafted the cancellation letter, had her sign it, and sent it without her knowledge.

47.    In addition, the fifty-four (54) Attrition Forms and Customer Notes relating to conduct by Icon and its salespersons confirm the deceptive and fraudulent behavior detailed in the declarations above and reveal that Icon's scheme is, and has been, widespread—aimed at numerous customers in at least nine (9) states:  California, Illinois, Indiana, Michigan, Minnesota, North Carolina, New Jersey, Pennsylvania and Texas.

48.    The Attrition Forms and Customer Notes relating to conduct by Icon and its salespersons evidence, among other, the following deceptive and fraudulent behavior by Icon and its salespersons:

a.    Saying that "Icon is acquiring, merging with, has taken over or is part of Monitronics" to at least fifteen (15) customers;

b.    Saying or implying that the salespersons are in fact "with Monitronics" to at least thirteen (13) customers;

c.    Saying that "Monitronics "is going out of business" or is "no longer in business" or is downsizing to at least eleven (11) customers;

14

d.      Saying that "Monitronics "SAI is taking over Monitronics accounts and salesperson had to switch them to SAI" or that Monitronics "changed or switched to SAI" to at least four (4) customers;

e.      Saying that "ADT is taking over Monitronics" or "ADT and Monitronics were the same company" to at least three (3) customers;

f.      Saying that customers would "still be with Monitronics" to at least two (2) customers;

g.      Saying that "Monitronics no longer services [customer's] area," or the customer's "alarm company was switching central stations because Monitronics has slow response times," that that Icon is the new service provider, and that the customer must sign contract to be monitored;

h.      Using the Monitronics' name to get inside the homes of or in relation to "updates" or "upgrades" for at least twenty-one (21) customers;

i.      Describing the proposed changes to the customers' alarm systems and monitoring services merely as "updates" or upgrades" without ever disclosing to the customers that what they are (or were) signing are (or were) new agreements with new companies or that they are (or were) in fact changing alarm monitoring service providers to at least eleven (11) customers;

j.      Sending at least three (3) cancellation letters to Monitronics without the Customer's authorization;

k.      "Making" at least two customers sign new agreements with Icon; and

l.      Knowing confidential customer information such as contract end-dates, amounts paid, or methods of payment (autopay), or using a Monitronics' customer list for at least five (5) customers.

49.     Icon salespersons also knows and is using information that Monitronics considers trade secrets, including confidential customer information such as Customer AMA end-dates, amounts paid under the Customer AMA, alarm system passwords and codes, details about payment and auto draft.  One customer told Monitronics that an Icon salesperson was looking at a Monitronics' customer list.  There is also a report of an Icon salesperson using Monitronics stickers.

50.     Despite the representations to the contrary made to Monitronics' customers by Icon salespersons, Icon is not acquiring, merging with, taking over, or a part of Monitronics; Icon salespersons are not "with Monitronics"; Monitronics is not downsizing, going out of business, or already out of business;  SAI is not taking over Monitronics accounts and Monitronics has not changed or switched to SAI; ADT is not taking over Monitronics and are not the same company;  customers who cancel and switch to Icon will not "still be with Monitronics", absent an agreement to the contrary; Monitronics has also not stopped servicing customer areas .  Monitronics has not given Icon permission to use any confidential customer information, customer lists, details of Customer AMA's or customer passcodes.

51.     Monitronics has never granted Icon or any Icon member or other agent any license, or any other permission, to use the Monitronics' Marks, or the "Monitronics" or "Monitronics International, Inc." names.

52.     Monitronics has also not authorized Icon salespersons to hold themselves out as Monitronics representatives or as being "with Monitronics."  Monitronics has never given Icon or its employees or agents or anyone acting on its behalf the permission to use Monitronics' trademarks or name.  Monitronics has not given Icon permission to use any confidential customer information, customer lists, details of Customer AMA's or customer pass codes.

## THE HARM TO CONSUMERS

53.     The conduct described above and evident in the customer declarations, Attrition Forms and Customer Notes has obviously disrupted, and will continue to disrupt, the lives, sense of security and actual security of Monitronics' customers.

54.     Certain customers are currently being double-billed for alarm monitoring services:  once by Monitronics and once by Icon, or some other provider with whom Icon sold the fraudulently obtained Customer AMA.  Many of the declarations and Attrition Forms show customers complaining about being doubled-billed, often because they were not even informed, and were not aware, that they were being switched to a different alarm monitoring company.

55.     Double-billing has created confusion among customers as to whether customers are required to pay their bill for Monitronics, even though Monitronics is entitled by the Customer AMA to bill the customers through the initial term, or any renewal term, of their contract.  Where customers do not pay their bill, those customers may be referred to a collections agency, which may impact their credit reports.

56.     In addition to the billing issues, Monitronics' customer service employees have received and continue to receive telephone calls from terminating customers who insist that their alarms are being monitored by Monitronics, even though Monitronics has received a request

purporting to be from that customer canceling their account.  Given the nature of the industry, it is essential for customers to be able contact the alarm monitoring company in the event of a false alarm or real emergency.

## THE IRREPARABLE HARM TO MONITRONICS

57.     As a result of defendants' wrongful conduct, at least fifty-four (54), and likely many more, Monitronics' customers have already cancelled their accounts and signed up with Icon this summer, beginning in May 2007.  In addition, many customers with whom Monitronics spoke could not remember the name of the company that called on them, but many were likely Icon.  Monitronics is continuing to receive additional cancellation letters and to fill out new Attrition Forms daily.

58.     The deceptive and fraudulent conduct detailed above has significantly disrupted and damaged Monitronics' business, such that Monitronics has been damaged well in excess of $75,000.00.  Most of the customers who have switched from Monitronics to Icon are effectively lost forever, and Monitronics will not experience the typical multiple year renewal pattern that it experiences with most of its customers.

59.     In addition, the deceptive and fraudulent conduct of Icon and its salespersons has caused, and continues to cause, irreparable harm to Monitronics' customer relationships, Monitronics' goodwill, and the Monitronics name in the community that has been built over the past thirteen (13) years.  The Monitronics' Marks have also been diluted, disparaged and damaged because the egregious conduct of Icon and its salespersons.  Many of Monitronics' customers and likely their neighbors, family and friends now think Monitronics is going, or has

gone, out of business or has merged with Icon or some other company—when no such thing is true.

60.     The conduct of Icon and its sales personnel described above began occurring at least as early as May 2007 and is continuing to occur in at least nine (9) states throughout the country, including California, Illinois, Indiana, Michigan, Minnesota, North Carolina, New Jersey, Pennsylvania, and Texas.

61.     Monetary remedies are insufficient to provide redress against the offending conduct, should it be allowed to continue.  Monitronics' relationship with customers and Monitronics' goodwill in the community have been irreparably injured and will continue to be injured if the offending conduct is not stopped.

62.     Monitronics does not wish to alienate or lose customers because of a situation created by the fraudulent and deceptive actions of Icon.  Monitronics continues to expend time and resources to attempt to ameliorate these situations and correct the misinformation being propounded by Icon's conduct.

## FIRST CAUSE OF ACTION
(Trademark Dilution— against all Defendants)

63.     Monitronics incorporates all of the allegations in this Complaint as though fully set forth in this cause of action.

64.     Beginning in 1994 and continuing to date, Monitronics has been doing business in the United States and abroad and has been using in commerce the Monitronics' M and related marks as trade names in connection with its alarm monitoring services.

65.     Plaintiffs have acquired trademark and service mark rights to the Monitronics' Marks, both at common law from and after said date and further by virtue of registrations with the PTO.

66.     The Monitronics' Marks are fanciful, famous and incontestable.

67.     The Monitronics' Marks are entitled to protection from dilution under the Federal Lanham Act.  15 U.S.C. § 1125(c) (2007).

68.     Monitronics has extensively advertised and promoted the Monitronics' Marks. Moreover, Monitronics has invested substantial time, energy, money and other resources to develop the Monitronics' Marks.  Each of the Monitronics' Marks is inherently arbitrary, fanciful, distinctive or suggestive, or has otherwise acquired secondary meaning in the relevant channels of trade to refer to Monitronics.

69.     From and after May 1, 2007, Defendants have commenced use in commerce of identical or at least confusingly similar to the Monitronics' Marks in connection with the promotion, advertising, offering for sale and sale of alarm systems monitoring products and services or other use in commerce as an indicator of origin of goods.

70.     Indeed, Defendants are using the Monitronics' Marks to steal Monitronics' customers.

71.     Monitronics has never granted Icon, Fisher or any Icon member or other agent any license, or any other permission, to use the aforementioned "Monitronics" registered mark, the aforementioned "Monitronics International, Inc." registered mark, or the Monitronics or Monitronics International, Inc. names.

72.     The use of the Monitronics' Marks by Defendants, including, but not limited to, in relation to the sale of alarm systems monitoring products and services, tends to dilute, and has in fact diluted, the famous nature of the Monitronics' Marks.

73.     Defendants knowingly used the Monitronics' Marks to deceive customers into believing it and its salespersons represented Monitronics.

74.     As a proximate result of Defendants' above-described willful conduct, Monitronics has been damaged in an amount to be proven at trial, including, but not limited to, consequential damages and that it is entitled to recover all of Icon's profits from its actions detailed herein as well as all of Monitronics' costs and reasonable attorneys' fees associated with this action.

75.     At all material times, Defendants have acted in bad faith, oppressively and maliciously toward Monitronics and its Customers, with intent to injure Monitronics, thereby entitling Monitronics to treble damages in an amount to be determined at trial, including, but not limited to, damages, lost profits and other consequential damages.

76.     The above described acts of Defendants have caused and are continuing to cause irreparable injury to Monitronics, for which Monitronics has no adequate remedy at law, and Defendants will continue to do so unless enjoined by this Court.

## SECOND CAUSE OF ACTION
(Trademark Infringement— against all Defendants)

77.     Monitronics incorporates all of the allegations in this Complaint as though fully set forth in this cause of action.

78.     The Monitronics' Marks are entitled to protection from infringement under the Federal Lanham Act.  15 U.S.C. § 1114(1) (2007).

79.     Defendants have created a likelihood of confusion with the Monitronics' Marks in the relevant marketplace to Monitronics' detriment and damage, thereby constituting infringement of Monitronics' registered and unregistered trademarks and service marks.

80.     As a proximate result of Defendants' above-described willful conduct, Monitronics is informed and believes and based thereon alleges that it has been damaged in an amount to be proven at trial, including, but not limited to, consequential damages and that it is entitled to recover all of Icon's profits from its actions detailed herein as well as all of Monitronics' costs and reasonable attorneys' fees associated with this action.

81.     At all material times, Defendants have acted in bad faith, oppressively and maliciously toward Monitronics and its Customers, with intent to injure Monitronics, thereby entitling Monitronics to treble damages in an amount to be determined at trial, including, but not limited to, damages, lost profits and other consequential damages.

82.     The above described acts of Defendants have caused and are continuing to cause irreparable injury to Monitronics, for which Monitronics has no adequate remedy at law, and Defendants will continue to do so unless enjoined by this Court.

### THIRD CAUSE OF ACTION
(Federal Unfair Competition— against all Defendants)

83.     Monitronics incorporates all of the allegations in this Complaint as though fully set forth in this cause of action.

84.     The actions by Defendants detailed herein constitute unfair competition, in violation of the Federal Lanham Act.  15 U.S.C. §1125(a).

85.     As a proximate result of Defendants' above-described willful conduct, Monitronics has been damaged in an amount to be proven at trial, including, but not limited to, consequential damages and that it is entitled to recover all of Icon's profits from its actions detailed herein as well as all of Monitronics' costs and reasonable attorneys' fees associated with this action.

86.     At all material times, Defendants have acted in bad faith, oppressively and maliciously toward Monitronics, with intent to injure Monitronics, thereby entitling Monitronics to treble damages against Defendants in an amount to be determined at trial.

87.     The above described acts of Defendants have caused and are continuing to cause irreparable injury to Monitronics, for which Monitronics has no adequate remedy at law, and Defendants will continue to do so unless enjoined by this Court.

### FOURTH CAUSE OF ACTION
(Federal Trade Libel— against all Defendants)

88.     Monitronics incorporates all of the allegations in this Complaint as though fully set forth in this cause of action.

89.     The actions by Defendants detailed herein constitute trade libel (false advertising), in violation of the Federal Lanham Act.  15 U.S.C. §1125(a).

90.     Defendants have made numerous material false or misleading representations of fact in conjunction with their efforts to steal customers, including without limitation those described at length above.

91.     Defendants' use has been and continues to be in the course of business and is commercial in nature.

92.     Defendants have created a likelihood of confusion with the Monitronics' Marks in the relevant marketplace as to the origin, association and/or approval of the Monitronics' badges and I.D. cards and the characteristics of the services offered by Icon.

93.     As a proximate result of Defendants' above-described willful conduct, Monitronics has been damaged in an amount to be proven at trial, including, but not limited to, consequential damages and that it is entitled to recover all of Icon's profits from its actions detailed herein as well as all of Monitronics' costs and reasonable attorneys' fees associated with this action.

94.     At all material times, Defendants have acted in bad faith, oppressively and maliciously toward Monitronics, with intent to injure Monitronics, thereby entitling Monitronics to treble damages against Defendants in an amount to be determined at trial.

95.     The above described acts of Defendants have caused and are continuing to cause irreparable injury to Monitronics, for which Monitronics has no adequate remedy at law, and Defendants will continue to do so unless enjoined by this Court.

## FIFTH CAUSE OF ACTION

(Tortious Interference with Existing and Prospective Economic Relations—against all Defendants)

96.     Monitronics incorporates all of the allegations in this Complaint as though fully set forth in this cause of action.

97.     Defendants intentionally interfered with Monitronics' existing economic relations, by intentionally, knowingly and willfully inducing Customers to breach and/or terminate Customer AMA's.

98.     Defendants intentionally interfered with Monitronics' existing economic relations for an improper purpose and using improper means, such as the fraudulent and deceptive practices, described at length above.

99.     Defendants intentional interference with Monitronics' existing economic relations causes direct injury to Monitronics in actual lost revenue on the Customer AMA's which have been cancelled and/or breached, in time and expense in investigating the cancellations, in time and expense in attempting to salvage customer relationships damaged by Defendants' interference, and in lost future revenue on Customer AMA's which have been cancelled.

100.     As a proximate result of Defendants' above-described willful conduct, Monitronics is informed and believes and based thereon alleges that it has been damaged in an amount to be proven at trial, including, but not limited to, consequential damages and that it is entitled to recover all of Defendants' profits from its actions detailed herein as well as all of Monitronics' costs and reasonable attorneys' fees associated with this action.

101.     At all material times, Defendants have acted in bad faith, oppressively and maliciously toward Monitronics and its Customers, with intent to injure Monitronics, thereby

entitling Monitronics to punitive damages against Defendants in an amount to be determined at trial.

102.　　The above described acts of Defendants have caused and are continuing to cause irreparable injury to Monitronics, for which Monitronics has no adequate remedy at law, and Defendants will continue to do so unless enjoined by this Court.

**SIXTH CAUSE OF ACTION**
(State Unfair Competition—against all Defendants)

103.　　Monitronics incorporates all of the allegations in this Complaint as though fully set forth in this cause of action.

104.　　Defendant's actions are a violation of various state deceptive practices laws designed to protect consumers from confusion, including without limitation California's statutory prohibition of false advertising, Business and Professions Code § 17500; the Illinois Uniform Deceptive Trade Practices Act, 815 ILL. COMP. STAT. 505/1 *et seq.*; the Michigan Consumer Protection Act, MICH. COMP. LAWS § 445.901 *et seq.*; Minnesota's Deceptive Trade Practices Act, MINN. STAT. § 325D.43 *et seq.*; N.J. STAT. § 56:3-13.16; N.C. GEN. STAT. § 80-11; Utah's Unfair Competition Act, Utah Code Ann. § 13-5a-1 *et seq.*; WASH REV. CODE §§ 19.77.140, 19.77.150, 19.77.160, 19.77.900.

105.　　Defendants intentionally, willfully and knowingly continue to infringe the Monitronics' trademark and trade name rights associated with the Monitronics' Marks.

106.　　Defendants' use has been and continues to be in the course of business and is commercial in nature.

107.    Defendants' use is an unlawful violation of various state and federal laws, as alleged herein.  Defendants' use is unfair, as Defendants have gained a competitive advantage by misleading and confusing customers and other consumers.  Defendants' use is fraudulent, as Defendants have gained such advantage by presenting false and deceptive information to customers and other consumers.

108.    Defendants' use is an infringement of Monitronics' trademark and trade name rights associated with the Monitronics' Marks.

109.    Defendants' actions have materially damaged, and are materially damaging, Monitronics' intellectual property.

110.    Monitronics is entitled to actual damages, costs and attorneys fees, and punitive damages, as a result of the Defendants' failure to discontinue infringement of the Monitronics' trademark and trade name rights associated with the Monitronics' Marks.

111.    The above described acts of Defendants have caused and are continuing to cause irreparable injury to Monitronics, for which Monitronics has no adequate remedy at law, and Defendants will continue to do so unless enjoined by this Court.

**SEVENTH CAUSE OF ACTION**
(State Consumer Protection—against Icon, Fisher and John Does)

112.    Monitronics incorporates all of the allegations in this Complaint as though fully set forth in this cause of action.

113.    Defendants' actions are a violation of various state consumer fraud protection laws designed to protect consumers from fraud and deceptive practices, including without limitation California's statutory prohibition of unfair competition, Business and Professions

Code, § 17200; the Illinois Consumer Fraud Act, 815 ILL. COMP. STAT. 505/1 *et seq.*; the

Michigan Consumer Protection Act, MICH. COMP. LAWS § 445.901 *et seq.*; Minnesota's

prohibition against false advertising, MINN. STAT. § 325F.67; Minnesota's law for the prevention

of consumer fraud, MINN. STAT. § 325F.69 and MINN. STAT.  § 325F.71 (imposing additional

penalties for consumer fraud against the elderly); New Jersey Consumer Fraud Act, N.J. STAT. §

56:8-1 *et seq.* ; N.C. GEN. STAT. § 75-1.1; Utah's Consumer Sales Practices Act, Utah Code Ann.

§ 13-11-1 *et seq.*; WASH REV. CODE § 19.86.010 *et seq.*

114.    Defendants' fraudulent and misleading oral representations to consumers,

including without limitation those described at length above, are deceptive acts prohibited by

laws protecting consumers in the various states.

115.    Defendants have intentionally, willfully and knowingly committee such deceptive

acts.

116.    Defendants' deceptive acts are unconscionable and damage the public good.

117.    Defendants' use is unlawful, as a violation of various state and federal laws, as

alleged herein.

118.    Defendants' use is unfair, because it is immoral, unethical, oppressive,

unscrupulous and/or substantially injurious to consumers.

119.    Defendants' use is fraudulent, as Defendants have presented false and misleading

information to Customers and other consumers, which is likely to deceive.

120.    Defendants' actions have damaged, and are damaging, Monitronics' existing and

prospective business relations with Customers.

121.     Monitronics is entitled to actual damages, in an amount no less than $75,000, to be determined at trial, and costs and attorneys fees.

122.     The above described acts of Defendants have caused and are continuing to cause irreparable injury to Monitronics, for which Monitronics has no adequate remedy at law, and Defendants will continue to do so unless enjoined by this Court.

## EIGHTH CAUSE OF ACTION
(State Trade Secrets Acts—against all Defendants)

123.     Monitronics incorporates all of the allegations in this Complaint as though fully set forth in this cause of action.

124.     Certain proprietary information of Monitronics, including without limitation customer lists, expiration dates, pricing information, system requirements, and pass codes, constitute trade secrets (the "Monitronics' Trade Secrets") protected by various state laws, including without limitation the Uniform Trade Secrets Act, California Civil Code § 3426 et seq.; the Michigan Uniform Trade Secrets Act, MICH. COMP. LAWS § 445.1901 *et seq.*; the Minnesota Uniform Trade Secrets Act, MINN. STAT. § 325C.01 *et seq.*; N.C. GEN. STAT. § 66-152 *et seq.*; the Utah Uniform Trade Secrets Act, Utah Code Ann. § 13-24-1 *et seq.*; Washington Uniform Trade Secrets Act, WASH REV. CODE § 19.108.010 *et seq.*

125.     Monitronics' Trade Secrets are not generally known or ascertainable by its competitors, and Monitronics derives independent economic value from the fact that Monitronics' Trade Secrets are not generally known or ascertainable by its competitors

126.    Monitronics protects the secrecy of the Monitronics' Trade Secrets through a system of contractual terms designed to prevent unauthorized use of and/or access to the Monitronics' Trade Secrets.

127.    Defendants have used the Monitronics' Trade Secrets in violation of the same, to the injury of Monitronics.

128.    Defendants Icon, Fisher and John Does acquired the Monitronics' Trade Secrets by wrongful manner, having known of the obligations of other Defendants to maintain the secrecy of the Monitronics' Trade Secrets and to refrain from using the same, to the injury of Monitronics.

129.    As a proximate result of Defendants' above-described willful conduct, Monitronics has been damaged in an amount no less than $75,000, to be proven at trial, including, but not limited to, consequential damages.

130.    Because Defendants' misappropriation of the Monitronics' Trade Secrets has been willful and malicious, Monitronics is entitled to reasonable attorneys fees and double damages in an amount to be determined at trial, including, but not limited to, damages, lost profits and other consequential damages.

131.    The above described acts of Defendants have caused and are continuing to cause irreparable injury to Monitronics, for which Monitronics has no adequate remedy at law, and Defendants will continue to do so unless enjoined by this Court.

## NINTH CAUSE OF ACTION
(Conversion—against all Defendants)

132.    Monitronics incorporates all of the allegations in this Complaint as though fully set forth in this cause of action.

133.    Icon has wrongfully converted to its own use certain Monitronics' customer lists, badges and I.D. cards and physical copies of the various Customer AMAs.

134.    Monitronics has been, at all times, entitled to immediate possession of its property.

135.    Defendants exercise of dominion or control over Monitronics' property is intentional and willful;

136.    Defendants' exercise of dominion or control over Monitronics' property is without right or justification;

137.    Defendants have deprived Monitronics of the exclusive use, possession, benefit, control, and value of its property.

138.    Due to  Defendants' conversion of the property, Monitronics is entitled to a return of the property or damages in an amount to be determined at trial.

## TENTH CAUSE OF ACTION
(Defamation—against all Defendants)

139.    Monitronics incorporates all of the allegations in this Complaint as though fully set forth in this cause of action.

140.    Defendants published statements concerning Monitronics that were false, including without limitation that Monitronics was going out of business or had gone out of

business, that Monitronics was a related or affiliated entity of Defendants, that Monitronics was

merging with one of the Defendant entities, and that Defendants were agents of Monitronics.

    141.    Defendants' false statements are defamatory and not subject to any privilege.

    142.    Defendants' false statements were published with the unlawful objective to harm

Monitronics and profit by stealing Customers.

    143.    Publication of Defendants' false statements resulted in damage to Monitronics, in

an amount no less than $75,000, to be determined at trial.

### ELEVENTH CAUSE OF ACTION
(False Pretenses / Deceit—against all Defendants)

    144.    Monitronics incorporates all of the allegations in this Complaint as though fully

set forth in this cause of action.

    145.    Defendants have made false representations of fact to Monitronics, in fraudulently

representing themselves as customers of Monitronics and requesting to cancel a Customer AMA.

    146.    Defendants knew, at all times, that the representations of fact were false.

    147.    Defendants made the false representations of fact concerning Monitronics for the

sole purpose of inducing Monitronics to cancel Customer AMA's, so that Defendants could

solicit, using the deceptive and fraudulent methods described herein, Customers away from

Monitronics.

    148.    Because of seemingly straightforward nature of the requests to cancel and

Defendants' knowledge of Monitronics' business methods, Monitronics' reliance on the

Defendants' false representations was justifiable.

149.   Defendants' false statements, made directly to Monitronics, resulted in damage to Monitronics, including without limitation lost past, present and future revenue on cancelled Customer AMA's, in an amount no less than $75,000, to be determined at trial.

## TWELFTH CAUSE OF ACTION
### (Fraud / Negligent Misrepresentation—against all Defendants)

150.   Monitronics incorporates all of the allegations in this Complaint as though fully set forth in this cause of action.

151.   Defendants have made representations concerning a presently existing material fact, on multiple independent occasions, each time that the Defendant was, in fact, a specific customer and that the specific customer desired to cancel service with Monitronics.

152.    Such representations about the identity of Defendant were and are false, and Defendants knew, at all times, that they were false.

153.    Such representations about the desire to cancel were and are false, and Defendants knew, at all times, that they were false, or Defendants made them recklessly, knowing that they had insufficient knowledge upon which to base such representations.

154.   Defendants made the false representations of fact for the sole purpose of inducing Monitronics to cancel Customer AMA's, so that Defendants could solicit, using the deceptive and fraudulent methods described herein, customers away from Monitronics.

155.   Monitronics was, at all times, unaware of the falsity of such representations, and it did act reasonably in relying thereon because of seemingly straightforward nature of the requests to cancel and Defendants' knowledge of Monitronics' business methods.

156.    Monitronics did, in fact, rely on such representations and was induced to cancel actual Customer AMA's because of the false representation.

157.    Defendants' fraud resulted in damage to Monitronics, including without limitation lost past, present and future revenue on cancelled Customer AMA's, in an amount to be determined at trial.

158.    As a proximate result of Defendants' above-described willful conduct, Monitronics is informed and believes and based thereon alleges that it has been damaged in an amount no less than $75,000, to be proven at trial, including, but not limited to, consequential damages and that it is entitled to recover all of Defendants' profits from its actions detailed herein as well as all of Monitronics' costs and reasonable attorneys' fees associated with this action.

159.    At all material times, Defendants have acted in bad faith, oppressively and maliciously toward Monitronics and its customers, with intent to injure Monitronics, thereby entitling Monitronics to punitive damages against Defendants in an amount to be determined at trial.

160.    The above described acts of Defendants have caused and are continuing to cause irreparable injury to Monitronics, for which Monitronics has no adequate remedy at law, and Defendants will continue to do so unless enjoined by this Court.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Monitronics International, Inc. prays for judgment as follows:

1.  For a Temporary Restraining Order, Preliminary Injunction and permanent order of this Court restraining and enjoining Defendants as set forth in

Monitronics' *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR LIMITED EXPEDITED DISCOVERY filed contemporaneously with this Complaint.

2.   For a permanent order of this Court declaring that any Customer AMA, executed by a Customer as a result of Defendants' wrongful conduct, is voidable at the option of the Customer;

3.   For monetary damages no less than $75,000, in the precise amount to be proven at trial;

4.   For pre- and post-judgment interest at the maximum rate allowed by law or by contract;

5.   For exemplary damages for the sake of example and by way of punishing Defendants, in an amount to be proven at trial;

6.   For treble the amount of any damages as described above in the Second Cause of Action under 15 U.S.C. §1125(a), the precise amount to be proven at trial;

7.   For double the amount of any damages as described above in the Sixth Cause of Action under Utah Code Ann. § 13-24-1 *et seq*., the precise amount to be proven at trial;

8.   For reasonable attorneys' fees and costs as allowed by law or by contract; and

9.   For such other relief as the Court deems just and equitable.

DATED this 12th day of August, 2007.

/s/  Peter W. Billings
                                                  
Peter W. Billings
Jason W. Hardin
Timothy K. Clark
FABIAN & CLENDENIN,
  A Professional Corporation
Attorneys for Monitronics International, Inc.

Plaintiff's Address:
Monitronics International, Inc.
2350 Valley View, Suite 100
Dallas, Texas 75234-5736

ND: 4817-9136-3841, Ver  2